May it please the Court, Arthur Rooney on behalf of Appellant Kiewit Corporation. The only issue in this case is whether the defendant met its burden of proof with respect to the amount of controversy to remove a putative wage and hour class action to federal court under the Class Action Fairness Act. At no point has plaintiff in this case denied that the complaint places more than $5 million in controversy, nor has plaintiff ever offered any evidence to rebut any of Kiewit's evidence, any of Kiewit's calculations, any of Kiewit's assumptions in this case. Instead, plaintiff primarily has argued two things, and it did this at the district court and is doing it before this court. Plaintiff argues that Kiewit provided no evidence with its notice of removal, that it based it solely on assumptions. That argument's been squarely rejected by the Supreme Court in Dart, Cherokee, and in this case, and in this court in Ibarra, La Crosse, and other cases. Second, the plaintiff argues that Kiewit is not permitted to use assumptions or any sort of chain of reasoning in order to come up with the damages calculations to provide the amount of controversy. Again, that argument's been rejected by the Supreme Court and by this court repeatedly. Once the motion to notice of removal was challenged on the motion to remand, Kiewit provided a declaration from its human resources officer that provided the number of putative class members, the average hourly rates. It indicated these were all full-time employees who worked an average of nine hours plus a day. They worked five to six days a week. They made an average of $38 an hour. That declaration also provided the specific number of work weeks that issued work by these potential class members during the limitations period. We then took those numbers in opposition to the motion to remand and provided calculations and estimates based on just four of the seven claims in the case, the meal break claim, the rest break claim, the waiting time penalty claim, and the overtime claim. And with those, we got to $37 million on four of the seven claims. And that does not account attorneys' fees, which the plaintiffs are seeking in this case. And, again, all we needed to get to was $5 million at stake. Before the district court ---- Start with the ---- I can't remember which claim this is, but is it ---- what's the difference between the waiting time claim and the overtime claim? So, essentially, if an employee in California is denied anything, whether it's a rest break, a meal break, one minute of off-the-clock work, whether it's straight time or overtime, then when they leave the company's employment, they haven't been paid for everything, whether it's $1 or $1 million. So if they haven't been paid for everything, again, even if it's one cent, they're entitled to waiting time penalties for 30 days. And those waiting time penalties are 30 days of your average daily pay for 30 consecutive days. And so that claim gets you to ---- the individuals here made over $38 an hour. They worked over $9. They worked over 9 hours a day. If you do that by 30, you get to $17 or $18 million on that claim alone. And that just assumes, even if someone had one minute, one missed rest break, one missed meal period. Maybe can you ---- I'm just looking at paragraph 16 of their complaint. I don't know if you have that in front of you. I can grab it. I just was hoping you could walk us through the math on that one. That's the one in which they say that defendants maintain a policy in which employees are required to work off the clock, whereby plaintiffs in the class are required to wait in line between 5 to 10 minutes in order to clock into work each day and approximately 20 minutes in order to clock out. And so what they're claiming there is, and that triggers a host of claims. So in that paragraph, they're alleging that everybody, each day, they use it 5 ---- it comes out to 25, 30 minutes each day they're waiting to clock in and clock out. And they're working 5 to 6 days. Plaintiff admits in the complaint he worked 5 to 6 days a week. We have a declaration. Everybody's full time. And they work 9 hours plus a day. So anything they're working is overtime. Any off-the-clock work would be overtime. So under plaintiff's allegation, we deny it, but under plaintiff's allegation, they are working off the clock a minimum while they're waiting to clock in and out each day, their words, 30 minutes, 25 to 30 minutes a day. If you do simple math, that's 2 1⁄2 hours roughly a week. If you take that, that's 2 1⁄2 hours of overtime a week. That also triggers waiting time penalties because you weren't paid for that overtime each week. That also triggers inaccurate wage statements because your pay stub doesn't have those hours to pay or the hours recorded on those. So you're going to get derivative claims. You're going to get waiting time penalties for not being paid for waiting in line. You're going to get penalties for your wage statement being inaccurate. Each pay stub that's inaccurate, they're paid weekly, not biweekly. So each and every week when they get that pay stub, they get a penalty for that. We didn't even include that. That number alone would be 8 million. We didn't even include it because we were up to 38 million. If you look at the cases where motions to remand have been denied, if you take a look at them, you're often dealing with 800 people, 900 people who make $10 an hour, 40,000 work weeks. Motions to remand denied. The case easily satisfies the 5 million in controversy. Here we're talking about much greater numbers. We're talking about over 2,500 people as of February. That number has obviously grown. We're talking about over $38 an hour. People who all work are all triggering overtime each day because they're working nine hours plus each day. So if you compare this case to other cases where motions to remand have been denied, our numbers are actually much greater on every front. There was actually a recent case in the Central District of California that came out at the end of October. We cited it in our brief. Andre, the Beacon Sales. What's interesting there is it's the same claims and it's almost exactly half the numbers. There's 939 people there. We have over 2,500 people. There's 50,000 work weeks there. We have about 100,000. They make $17 an hour there. They make $38 here. We're about double. It seems to me the district court is, I mean, you do have the white declaration which gives you the employment numbers. So they can't say there's no evidence. You've submitted the right declaration. But it seems to me what the district court is really saying is how do you come up with a 40% violation rate? I mean, there's no evidence to suggest that that's right. It seems to me that's what their argument is. That's what, if there is anything, the district court said. Answer that. I agree with that. How do you do that? Well, you have to make some reasonable assumption. Well, I guess the reasonability of the assumption is based on what? It would be based on the complaint. The complaint alleges. I know what the complaint doesn't say 40%. The complaint would say it's 100%. You came up with, well, the complaint, you don't know what it says because it could be 100 and yet it could be not because they're trying to get out of coming to federal court. How did you come up with 40%? That's what they're saying. Give us a little evidence to come up with this 40% violation rate. Well, if so, we had our notice of removal was actually very conservative. The plaintiff only worked. Well, the notice of removal is not what we have in front of us anyway. I agree. And so with respect to the various claims, the overtime claim we based it off of the 25 to 30 minutes each day, which is their own complaints. The minutes are fine, 5 to 10 minutes every day, the wait to get in, 20 minutes every day, wait to come out. But then you come up with a 40% violation rate. The reason I asked you to focus on paragraph 16 is that I don't think you're relying on any percentage violation rate for that one, right? Exactly. And does that get you to $5 million by itself? That gets you to $5 million by itself. It also gets you the waiting time penalties, which is $18 million, because that's the derivative claim. If we lose the overtime claim based on the 25 to 30 minutes, they also get waiting time penalties, which is $18 million. So we're $23 million there based on paragraph 16. But as I understand it then, the waiting time penalty that you have is a compilation of the unpaid overtime hours plus the meal and rest breaks hours, but none of them ever having been paid. So that's how we come up with the waiting time penalty? No, Your Honor. Basically, if you're owed anything, whether it's a minute or whether it's one rest period or a million rest periods, you get 30 days' pay after you leave your employment. So we're basing that off of if they waited in line 25 to 30 minutes to clock out, as they allege in paragraph 16, even if they got every meal break, even if they got every rest break, they still get waiting time penalties, which is $18 million. I understand, but what? So you got 1,705 employees that left the employment, right? That's how you came up with that? Correct. If I look at the white? Correct. But of those 1,705 employees, they make employees that have suffered from either unpaid overtime or meal and rest breaks, correct? Correct. If there's any violation, then those people. No other violations, just those. No other failure to pay. No other claim that would be failure to pay, just from unpaid overtime and meal and rest breaks. If those individuals had any unpaid straight time, any unpaid minimum wages. But nobody alleges that. They do in the complaint. They allege minimum wage and straight time as well. We didn't include it because we, in our view, we easily exceeded the 5 million threshold. But they do include a claim for minimum wages. They include a claim for straight time wages. They include a claim for overtime. They also include a claim for double time. We based it off just on overtime, which everybody would get if they're working an average of nine hours a day. They would at least get a time and a half. I'd like to reserve the rest of my time. Very good.  Let's hear from your opponent. Thank you for enduring the heat with everyone else here, Your Honors. I appreciate that. It feels warm in here to you, too. And the privilege of speaking before this panel. I appreciate that. H. Scott Leviant on behalf of Plaintiff Avila. Why don't you start with Paragraph 16? Sure. Just walk me through the math as to why that, the allegations there on their own, totally apart from any estimated percentage of violations and all of that. Why doesn't that add up to $5 million? Paragraph 16 dovetails into one of the major points that I wanted to make during my comments today. And that goes to the distinction between what the defendant did show versus what the defendant says it could show. And I believe that this panel should be careful about. I'm actually asking you to assume that you are going to be able to prove what you've alleged in Paragraph 16. And in light of the information we have from the declaration, I do the math. I'm not very good at math. But I do the math, and that gets you over $5 million before you even get into any penalties or anything, just based on the overtime itself. So I'm asking you because I'm prepared to rule against you on the basis of this alone. Tell me why I shouldn't do that. Just walk me through math-wise why it doesn't add up. Let me tell you why their math is wrong and why looking at one of the more recent decisions of the Ninth Circuit, the Arias versus Marriott case, which got some attention after the decision was issued by the district court in this case, actually restricts what they've done. The defendants allowed to make some reasonable assumptions. Our position isn't that they can make no assumptions, but they have to be reasonable. In light of the allegations. In light of the allegations. Now, when you look at what's being described, people have to wait in line in order to clock out or to clock in, and then they have to wait a longer period of time to clock out. Now, there's an inelegant turn of phrase in this writing, but if we use common sense, a person waiting in line to clock out at the end of the day is on the clock, meaning they are being paid to stand there to get to the time clock to clock out. So the rational interpretation of waiting in line for 20 minutes to clock out doesn't trigger any sort of unpaid wage obligation. Only time that you contend is under the employer's control waiting to clock in. The second reasonable interpretation you would have to make regarding an allegation of a line that could last up to five to ten minutes to clear to clock in is that someone is going to be at the front of that line and someone else is going to be at the back of that line. And the person who's at the front of that line walks up, and whether it's a time sheet or a thumb stamp or a punch card, they effectively wait no time based on the random arrival of different individuals in line. And the person at the back of the line, if the allegation were proven true, waits. Let me just read to you what it says, because what you're saying here doesn't line up in my mind at all. You say, defendants maintain a policy in which employees are required to work off the clock, right, not on the clock, as you said, off the clock. Yes, right. Whereby plaintiff and the class are required to wait in line between five to ten minutes in order to clock into work each day and approximately 20 minutes in order to clock out of work each day, all uncompensated. I don't know how else you read that other than to say that you are charging them with failing to pay them for that amount of time for each employee for each day. Now, you might want to try to spin it differently. Maybe you wish you had drafted it differently, but they're entitled to take you at your word here. And so, again, I'm asking you, in light of what you've actually said here, not the spin you've tried to offer today, walk me through the math that doesn't get you to $5 million on the basis of that alone. I would have to concede that if the position of the court is it's going to construe the allegation as 25 to 30 minutes for every person for every single day unpaid, then no, I can't show you math. That's what it says. Is there some different reading that you're prepared to offer us? I've explained what I think is actually a rational interpretation of that. I certainly wasn't the author and wish that I could get my hands on the author, but seeing as how I replaced the author, you know, that opportunity eluded me. But what I'm pointing out is that the courts recognize that you look at the allegations and make rational construction of them. And to me, even poorly or erroneously worded allegations, when you apply logic to them, have to be read in a common sense way. And if a person is alleged to be standing in line two o'clock out, then the inference from that part of the allegation is that they're still on the clock. That's not what it alleges. And to me, those two provisions in there are actually irreconcilable. So then you have an allegation that has an internally inconsistent error in it. A person is waiting in line on the clock, two o'clock out, because that's the inference of being on the clock, and then it says all uncompensated. And to me, those two provisions are internally inconsistent. And so what the defendant is then doing is it has the opportunity to pick the one that it prefers to do the calculation in a pair of clauses that, to me, don't add up in a logical sense. Well, it makes it very difficult when the standard of review here is that we have to look at what's alleged in the complaint and whether this is a reasonable basis for what's alleged. We can't say, well, the plaintiff in the complaint didn't do a good job, and we wish we could fine the guy because he's a stoop. We can't do that. We have to look at what's in the complaint. That's why the question is important. And then if we use the 40 percent, the violation rate, they're really not saying it happens with everybody. They're saying it only happens 40 percent of the time. So why, and I guess I'm trying to figure out if it's all off the clock, how they would have ever been able to do anything to make it any less than 40 or more than 40. And as I understand their argument, it is, well, others in other cases have assumed this kind of a rate, and they've been told that it was okay, so that's what we're using. We're not trying to get too out of it. We're not trying to get it too high in order to get our complaint. We're just trying to use the average that's used in all these cases in California. So then if you use that 40 percent, you're still at 11 million. And I certainly wouldn't, if being candid, have contended that I thought I had an excellent opportunity to hold the district court's order without being reversed when coming before this panel. So in all candor. The district court said, the district court made its whole decision on that it happened every time, every time, every time. And that's not what was even alleged. So the district court didn't even go with what was really alleged here. So that's what was a little bit worrisome. But I'm trying to even help you, and that's why I'm asking you these questions. No, I mean, the issue I think that secondarily gets invoked in the CAF removal is there's two standards that occur, and they're different standards of proof. At the notice of removal stage, Dark Cherokee from the Supreme Court has made it clear that you can use a reasonably constructed assertion of the amount in controversy. And if no one challenges that, and the courts have said if neither the court nor the plaintiff challenged that, then that reasonable assertion of the amount in controversy, if it's more than 5 million, stands. Right. When it's challenged by a plaintiff or the court, then you have a different standard, and that standard is preponderance of the evidence. Well, but preponderance of the evidence, if they're off the clock and no way to gauge it, which is what is alleged, so you make a reasonable assumption of the violation rate, it seems still that on the motion to remand, the amount you put before the court should be sustained, as they have in these other cases. That's the worry that I have. I mean, you're going to say, well, they need more evidence. I'm going to say, where would they have got it? If they're all off the clock, there's no way to get it. You've got to make an assumption then, and they made an assumption of 40%. I'm not sure the 40% is exactly where they went, because when I do my math, I would have said the claimed assumption rate is, well, maybe 66% on one and 80% on another, in trying to come up with the figures, because I tried to get it down to the nubbin, but I'm still saying your argument is about the assumed rate and nothing to back it up, but they used the only thing they could, given what the evidence is that there is to put in. I think that is actually an inaccurate statement. They're the employer. What evidence would they have if it's off the record? Well, they have access to all the current employees. Well, they do, and they gave you the list of all the current employees. It isn't as if there weren't any evidence here. White Declaration gave all the employment numbers. Well, the White Declaration gave some what I would call demographics of the class, an average pay rate and number of people, but what they have access to are actual employees to say, do you have to wait to clock in and clock out, and if so, how long? I mean, they could put in actual affirmative evidence and say, well, we don't agree it's 5 to 10 minutes, but here's 10 people on work crews that say they estimate they waited two minutes to clock in and do math with those numbers with employees that they actually control. Where are they going to get that evidence? From their employee base. They said that they have in the neighborhood of 1,000 current employees. All right. So certainly it's within their ability to be precise as opposed to assuming. Do we need to remand this based on ARIAS since it came out after this court's decision? And by that, do you mean? ARIAS came out after this court had made its, the district court had made its decision. Do we need to remand this based on ARIAS, or can we make this decision now? I think, honestly, this court could probably make the decision because I believe in ARIAS, the flaw that occurred in ARIAS was that the district court sua sponte remanded, and I believe that the dark Cherokee standard would have required the district court, if it was the challenging entity as opposed to the plaintiff, to issue something. In the briefing, I said something akin to an order to show cause and say, I have concerns as the court about your numbers, and I would like the parties to give me evidence, and then I will decide on preponderance of the evidence standard at the Phase 2 analysis if I'm remanding. And I think that's the flaw that occurred. You and I agree the district court's decision isn't even based on what's in the complaint. And so, therefore, it seems to me that this decision can't be affirmed. And so I'm trying to put together what do I do then. I guess if this panel concludes that literally an erroneous standard was applied that had been clarified by ARIAS after the decision, then perhaps it would be appropriate to remand and say, make sure you're doing the two-stage analysis and applying the allegations of the complaint. But in the event that the panel were to conclude that ARIAS isn't essential to determining the outcome of this question, then I think it could make the decision itself. So it would turn on whether the panel viewed something in ARIAS as either being clarifying of CAFA removal standards in the Ninth Circuit or changing or elaborating on something, as opposed to sort of restating the existing standard that Dark Cherokee suggested. I don't have any other questions. Okay. Thank you. Thank you, counsel. You've got more than adequate time, I think, for rebuttal. You don't have to use it all if you don't want to. Thank you. I'll just address a few of the points made by plaintiff appellees. The appellee opened up his argument by arguing that CUBIT was showing what could be at stake, and that wasn't appropriate. It needed to provide specific evidence. This Court has said, and ARIAS had said it in other cases as well, where removing defendant has shown potential recovery could, emphasis in ARIAS, could exceed $5 million, and the plaintiff has neither acknowledged nor sought to establish that the class recovery is potentially any less. The defendant has borne its burden to show that the amount of controversy exceeds $5 million. That's all we need to do is show what's at stake, what could be at stake. With respect to what we had in our opposition to the motion to remand, we based the overtime on the actual allegations in paragraph 16. As far as the respite claim, we used a 10% violation right there. As far as the meal period claim, we used a 20% violation right there. And the important thing, again, is any of those, even a 1% violation rate, even a one-minute wait time, triggers the derivative claims. And the waiting time penalty, which they have not challenged, is $18 million. You also have the inaccurate wage statement claims as well, the derivative statement. With respect to what this court should do or what it could do, ARIAS did not say it changed the law. ARIAS said it reaffirmed, because what was happening was district courts were taking a presumption against removal in CAFA cases, which is actually the opposite of what courts are supposed to do. So this court just reaffirmed three principles that were already in place by Ibarra, by La Crosse, by Dark Cherokee, by other cases. With respect to what the court can do now, we think this case is similar to La Crosse v. Knight Transportation. There, the district court remanded a case to state court before this court. It was a wage-hour case. The court looked at the allegations. It was a misclassification case. And the court said, based on these allegations in the complaint, based on the number of employees, there is sufficient evidence to find that $5 million was at stake. And it remanded the case to the district court with instructions that the amount of controversy element had been satisfied. And we believe that's the appropriate approach here. Unless there's any other questions, that's it. Okay, very good. Thank you very much.
judges: N.R. Smith, Watford, Korman